**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Tammy L. Hines**

    **v.**

Case No. 11-cv-262-PB
Opinion No. 2012 DNH 121

**Michael Astrue, Commissioner**
**Social Security Administration**

**MEMORANDUM AND ORDER**

    Tammy Hines seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her applications for disability insurance and supplemental security income benefits.  Hines contends that the Administrative Law Judge ("ALJ") who considered her applications erred in assessing her residual functional capacity ("RFC") and improperly relied upon the Medical-Vocational Guidelines to determine that she was not disabled.  For the reasons provided below, I affirm the Commissioner's decision.

**I.   BACKGROUND**[1]

    Hines applied for disability benefits on February 21, 2007, when she was twenty-nine years old.  She initially alleged a disability onset date of September 19, 2005, due to anxiety,

---

[1] The background information is taken from the parties' Joint Statement of Material Facts.  See L.R. 9.1(b).  Citations to the Administrative Transcript are indicated by "Tr."

asthma, and knee pain.  She subsequently amended the disability onset date to February 19, 2007.  Hines is a high school graduate who worked as a cashier, an amusement park ride operator, and a folder maker.

A.   **Medical History**

Hines received treatment at the Nashua Area Health Center ("NAHC") beginning in December 2003, when she was diagnosed with mild persistent asthma.  On September 14, 2005, she called the NAHC to report chest pains.  A doctor refilled her asthma prescriptions.  A week later, Hines went to the emergency room ("ER") complaining of intermittent sharp chest discomfort.  The diagnosis was atypical chest pain.  When she followed up with Dr. Bundschuh at the NAHC five days later, she reported that she had continued to experience similar chest pain since the ER visit.  She also complained that symptoms of her asthma had increased and that she had to use her inhaler more frequently. She was assessed with atypical chest pain that appeared to be musculoskeletal in origin.

Hines presented to the ER again the following month due to dizziness and chest pain.  The impression was chest wall pain and she was advised to apply heat to the area.

On December 19, Hines informed Dr. Bundschuh that she was taking Singulair for her asthma, but still had to use her

2

inhaler three to four times a day.  She stated that her asthma prevented her from working.  At a follow-up appointment on May 1, 2006, Dr. Bundschuh noted that Hines was doing well with her mild persistent asthma as long as she had access to medications. Later that same month, Hines returned to Dr. Bundschuh.  He again assessed stable asthma and recommended stress management.

On June 26, 2006, Hines went to the NAHC to follow up on an ER visit for asthma exacerbation.  She complained of intermittent chest pressure that occurred when she was stressed.

On October 18, Hines returned to the NAHC for a health maintenance visit.  The impression was a "well woman" with mild persistent asthma and psychological stress.  The following month, however, Hines again complained of right chest pain that she rated as six on a scale of one to ten.  The assessment was bronchitis.

On December 26, Hines went to the ER complaining of chest pain.  It was noted that Hines had made multiple visits to the ER for atypical chest pain.  This time she also complained of shortness of breath and palpitations.  The final diagnosis was chest wall pain and dehydration.  Two days later, she followed up with Carol Manning, a nurse practitioner at the NAHC, and rated her chest pain as seven out of ten.  The pain was

reproduced with pushing on the chest wall directly over the sternum.  The assessment was costochondritis.

On January 11, 2007, Hines again went to the ER complaining of chest pain.  She also reported experiencing occasional shortness of breath over the past few months.  The diagnosis was chest wall pain.

On January 17, Hines called the NAHC, stating that she was still having chest pains with any exertion.  Hines reported that she could not afford the medication that she had been prescribed.  The next day, Nurse Manning assessed Hines with unspecified abdominal pain and advised her to take Nexium.  She also noted that Hines was previously diagnosed with costochondritis and given prescriptions that she never filled. She had also been in the ER twice, but failed to follow the recommended treatment plans.

On February 1, Hines was again seen at the NAHC for her chest and abdominal pain.  She was assessed with unspecified abdominal pain, most likely due to gastritis.  She reported little improvement with Nexium.  Approximately two weeks later, however, she stated that Nexium was making her feel better.  She also reported experiencing anxiety for the past month.  Hines said she had blacked out the day before and was angry and yelling at people.  Upon examination, Hines appeared anxious,

4

but her judgment, insight, and memory were intact.  The
assessment was mild persistent asthma, unspecified abdominal
pain, knee pain, and generalized anxiety disorder.

The following month, Hines returned to the ER, complaining
of chest pain and abdominal pain.  She also reported having had
shortness of breath while going up and down stairs.  She stated
that she experienced "the shakes" due to her anxiety and that
she was on Paxil.  The diagnosis was abdominal pain.

Hines went to the ER again on May 1, 2007, for chest pain.
She stated that she experienced sharp chest pain with a racing
heart when sleeping.  She reported stress at home "mostly
because she has to watch her dog all day and the dog needs to go
outside every two hours."  Tr. 387.  The impression was atypical
chest pain and anxiety.  Three days later, Hines called the NAHC
complaining of anxiety and chest pain.

On May 8, Hines underwent a comprehensive psychological
profile performed by Dr. Francis Warman, a psychologist.  Dr.
Warman observed that Hines was nervous and anxious and had some
mild stuttering in her voice.  Hines reported having panic
attacks three or four times a day and experiencing chest pain,
shortness of breath, heart palpitations, occasional blackouts,
and occasional bouts of screaming.  She reported having had

5

difficulty sitting in school and paying attention, and noted that she was in special education through high school.

Dr. Warman's diagnosis was panic disorder without agoraphobia.  He noted that Hines appeared to have difficulties with concentration and believed that further testing for cognitive problems might be warranted.  He also stated that there was some indication of a learning disability, particularly in the areas of computation and distractibility.  According to Dr. Warman, Hines was able to understand and remember simple instructions and to interact appropriately and communicate effectively with others.  In light of her distractibility and hyperactivity, Dr. Warman noted that it would be difficult, but not impossible, for Hines to maintain her concentration and focus in work situations.  In addition, he opined that her frequent panic attacks would make it difficult, but not impossible, for her to maintain attendance and follow schedules at work.

On May 9, 2007, Hines was seen at the NAHC to follow up regarding her chest pain.  She was still having anxiety and rated her chest pain as five out of ten.  Nurse Manning diagnosed generalized anxiety disorder.  She noted that Hines had made many visits to the ER and NAHC for the same problem, and that numerous tests and cardiac workups showed no problem

other than anxiety.  Hines admitted that anxiety was taking over
her life and that she understood that there was nothing
seriously wrong when she had her attacks.  Nurse Manning
increased Hines's dosage of Paxil and prescribed Adavan for
emergency management of panic attacks.  She also referred Hines
to the Community Council of Nashua for counseling.

The following day, Nurse Manning wrote a letter addressing
Hines's medical issues as they related to her ability to work.
She opined that Hines's main issue was severe anxiety, which
frequently caused panic attacks.  She also indicated that Hines
had moderately severe asthma and was frequently symptomatic.

Dr. William Jamieson completed a psychiatric review on May
17, 2007.  He opined that Hines had mild restrictions in her
activities of daily living; no difficulties in maintaining
social functioning; moderate difficulties in maintaining
concentration, persistence, or pace; and no episodes of
decompensation.  In his mental RFC statement, Dr. Jamieson
concluded that Hines could understand, remember, and carry out
simple instructions; maintain attention in a simple job setting
with clear expectations and reasonable supervision; maintain
attendance and follow a schedule, despite some disruption due to
anxiety symptoms; sustain an ordinary routine without special

supervision; adequately relate with others; and respond appropriately to routine work changes.

On May 30, Hines presented to the NAHC complaining of dizziness, a headache, and left ear pain.  Nurse Manning assessed generalized anxiety disorder (improved on Paxil) and minor vertigo.  Five days later, Hines returned to the NAHC for dizziness and neck pain.  The impression was minor vertigo, and Hines's medication was increased.  Two days later, Hines still reported feeling dizziness and chest pain, but denied neck pain. She was referred to an ear, nose, and throat specialist for minor vertigo.

Hines went back to the NAHC on July 9 to follow up about her anxiety.  She reported feeling better.  The assessment was generalized anxiety disorder.  Hines felt that her anxiety was under good control.  It was also noted that her mild persistent asthma was generally under good control.

On July 31, Hines went to the ER, complaining of shortness of breath with a persistent cough for several days prior to the visit.  She also reported left mid-back pain with inspiration. The symptoms were attributed to asthma exacerbation.  Hines felt better after receiving an Albuterol nebulizer treatment.

Hines returned to the ER on August 17, complaining of shortness of breath that had been severe over the previous two

hours, and chest wall discomfort associated with a non-productive cough.  She reported using her inhaler approximately three to four times a day.  The final diagnosis was asthma.

Dr. Sabah Hadi, a consulting psychiatrist, filled out a mental RFC evaluation on January 11, 2008.  Dr. Hadi concluded that Hines had no limitations with respect to performing simple work; mild limitations in her ability to interact with others; and moderate limitations in her ability to respond to usual work situations and work changes.  "Moderate" was defined on the form as "more than a slight limitation in this area but the individual is still able to function satisfactorily."  Tr. 428.

On March 10, 2008, Hines went to the ER complaining of chest pain.  She felt like her heart was racing and she was short of breath.  The impression was right flank pain.  Hines was given Vicodin for the pain and advised to heat the area.  At a follow-up appointment at the NAHC on March 19, Hines rated her chest pain as nine out of ten.  The assessment was costochondritis.

On May 8, Hines returned to the NAHC, complaining of chest pain (again rated as nine out of ten), dizziness, and back numbness.  The assessment was unspecified chest pain.  Three days later, Hines presented to the ER due to chest wall pain. She was told to follow-up with Nurse Manning.  In June, she

again went to the ER due to chest pain.  The impression was left
chest wall pain.

On June 5, Nurse Manning filled out a medical source
statement on behalf of Hines.  She opined that Hines had a
slight limitation in her ability to understand, remember, and
carry out short and simple instructions; no limitation in her
ability to make judgments on simple tasks; no limitation in her
ability to interact with others; and a slight limitation in her
ability to respond to work pressures and routine changes.  Nurse
Manning noted that Hines was experiencing episodes of severe
anxiety with unpredictable triggers, and had mild asthma that
worsened during anxiety attacks.  She opined that Hines was
nonetheless capable of gainful employment, but that her
conditions possibly could cause her to be absent from work three
or more times per month, depending upon how well her anxiety was
controlled.

Based on a referral from Nurse Manning, Hines was seen at
the Community Council of Nashua on July 2.  Hines reported that
her panic attacks began after a car accident two years earlier.
Since then, she only felt safe using the city bus as a means of
transportation.  Hines described experiencing a heightened
startle response, a racing heart, difficulty breathing, shaking,
and feeling as though she would fall to the ground.  She felt

10

overwhelmed and easily distracted.  At times she would stop herself from leaving her home.  She complained of decreased sleep, appetite, memory, and concentration.  She also reported becoming agitated easily.

During her mental status evaluation, Hines's behavior, attitude, eye contact, and speech were within normal limits. Her thought process was normal and insightful.  Hines reported fleeting thoughts of self-harm without suicidal intent and no actions on the self-harm thoughts.  Her mood reflected anxiety and her affect was appropriate to her mood.  The intellectual functioning test showed that she had a short attention span with an average intelligence.  Her memory was impaired in immediate and recent recall.  She was oriented in all spheres and her judgment appeared to be adequate.  Her Global Assessment of Functioning ("GAF") score was 58.[2]

The next day, Hines went to the NAHC complaining of ongoing numbness in her arms, hands, legs, and feet.  The assessment was that the numbness was likely due to anxiety.

---

[2] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)."  Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000) ("DSM-IV").

Approximately a month later, Hines went to the ER due to
chest pain.  The impression was chest wall pain.  She was
advised to take Ibuprofen and to heat the area.

On August 26, Nurse Manning wrote that Hines suffered from
severe anxiety and mild persistent asthma.  She noted that Hines
had fairly frequent exacerbations and that Hines felt she was
unable to work.

Hines received counseling from Maureen Hayes, a licensed
mental health counselor at the Community Council of Nashua, on
six occasions between July and November 2008.  On September 3,
Hayes filled out a medical source statement.  She noted that
Hines had disorganized thinking, poor concentration, and poor
focus.  According to Hayes, Hines was moderately limited in her
ability to understand, remember, and carry out short, simple
instructions; make judgments on simple work-related decisions;
interact appropriately with the public, supervisors, and co-
workers; and respond to work pressures and routine changes in a
work setting.  "Moderate" was defined on the form as "more than
a slight limitation in this area but the individual is still
able to function satisfactorily."  Tr. 520.  The counselor noted
that dealing with changes increased Hines's anxiety and pain.
She also noted that Hines experienced isolation in social
interaction and that monitoring was needed for personal care.

12

Hayes opined that Hines was not capable of gainful employment on
a sustained basis at that time.

Hines was discharged from the Community Council of Nashua
three months later.  Her treatment was completed with her goals
mostly met.  It was noted that Hines attended appointments as
scheduled and worked on developing skills for reducing the
intensity and severity of her symptoms.  Hines reported a
noticeable reduction in symptoms.

Hines returned to the Community Council of Nashua on March
24, 2009, a week after the death of her husband, upon referral
from Nurse Manning.  Hines reported suffering from chronic worry
and felt like she was unable to express herself.  She felt
isolated and lonely, and lacked energy, interest, or motivation.
She also complained of sleep and appetite disturbances,
increased physical pain and panic attacks, a rapid heartbeat,
chest pain and pressure, shortness of breath, tingling in her
arms and legs, irritability, agitation, anger, a lack of memory,
and a lack of concentration.  When in a social setting, she
would completely shut down.  A mental status evaluation was
essentially normal, except her intellectual functioning showed a
short attention span with a below average to average
intelligence.  It was noted that her memory was impaired in
immediate and recent recall.  Her GAF score was 60.  She

subsequently received counseling from Maureen Hayes on six occasions between April and September 2009.

On April 13, 2009, Hines was seen by Dr. Lawrence Jasper, a consulting psychologist, for a comprehensive psychological examination.  Hines reported that a month prior to the evaluation, her 66-year-old husband of the past seven years had died.  She stated that she had been diagnosed with depression about a month prior to the examination.  Hines explained that the depression began when she was a child, but it grew worse during the six months before her husband died.  Hines reported that she was coded as educationally handicapped in school because she was a very slow learner and had attention deficit hyperactivity disorder.  She believed that she could not work because of pain, anxiety, and excessive irritability.

On mental status examination, Hines performed in the impaired range on the tests of immediate and intermediate verbal memory, which was consistent with Hines's report of having required a one-to-one aide in order to interpret classroom instructions.  Her speech was articulate and grammatical, her eye contact was good, affect was appropriate, thinking was goal directed, her intelligence appeared average, and her mood was within normal limits.  Hines described her anxiety level as elevated in response to extensive cognitive demands.  Dr. Jasper

14

assessed that Hines was able to understand and remember simple instructions; interact appropriately and communicate effectively with family, friends, her landlord, and fellow employees; sustain attention and complete simple tasks; and tolerate stresses associated with a typical work setting.

On April 26, 2009, Hines was brought to the ER by ambulance because she was having sharp, severe chest pain.  Diagnostic studies were essentially unremarkable.  The impression was costochondritis, improved after administration of Toradol.

Hines underwent a psychiatric evaluation by Dr. Jonathan Sobin on June 5, 2009.  She primarily complained of symptoms of panic disorder (two to three episodes per week) that were sometimes triggered by asthma attacks.  Her panic attacks manifested as a shortness of breath, tightness in her chest, pain, shaking, blackouts, and a fear of completely losing control.  Hines reported nervous reactions to being among people she did not know well and also complained of insomnia.  Dr. Sobin opined that Hines's degree of functional loss was between slight and moderate in daily activities, slight in social interactions, slight in task performance, and moderate in stress reaction.  His diagnostic impression was panic disorder with agoraphobia.

At a mental health counseling session on December 1, 2009,
Counselor Hayes noted that Hines had an increased sense of
sadness secondary to the loss of her husband.  Hines saw Hayes
for mental health counseling again on December 30, 2009.  On
March 23, 2010, Hines requested that her case be closed.

On June 4 and 18, 2010, Dr. Jasper, an examining
consultant, conducted an intelligence profile and
neuropsychological test battery.  Dr. Jasper noted that Hines
displayed an unusual lack of insight for an adult and that she
did not appear to be a fully accurate historian.  She reported
that panic attacks manifested in motoric shakiness, difficulty
breathing (which might escalate to an asthma attack), chest
pain, a rapid heartbeat, and numbness and tingling in her left
arm and right leg from the kneecap down.  Hines said she did not
have panic attacks if she stayed away from her disruptive
neighbors.

The examination was terminated by Hines about six hours
into the session.  Hines complained that her arm was too tired,
and that taking a break would not help her.  She also was
worried about her pet bird because she had forgotten to turn on
the air conditioning.  Hines was encouraged to call her
attorney, who strongly urged her to complete the examination.
During the call, she became genuinely upset, stating, "I'm just

full of emotion.  I'm afraid if I continue, I'm going to be in
an ambulance going to the hospital[.]"  Tr. 709.  After the
phone call, Hines explained that she felt that she might develop
a panic attack because she was so upset, which would trigger a
severe asthma attack.  The session was terminated and Hines
offered to come back to finish the testing.

Hines returned for her second appointment on June 18.  She
seemed happy and cooperative during the remaining portion of the
examination.  Dr. Jasper noted that Hines's speech was
articulate and grammatical and that her affect was bright and
cheerful.  He also noted that she became irritable and somewhat
labile on two occasions when placed under stress but was able to
maintain adequate self-control.

Dr. Jasper diagnosed panic disorder without agoraphobia and
borderline intellectual functioning.  He opined that Hines was
able to complete her daily activities; interact appropriately
with others in a work setting, despite some difficulty;
understand and remember very short, simple instructions;
maintain attention and concentration on simple tasks; and
tolerate stressors common to a work setting.

In an RFC statement, Dr. Jasper opined that Hines had
moderate limitations in her ability to understand, remember, and
carry out simple instructions; make judgments on simple work-

related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to work situations and changes in routine work settings.  "Moderate" was defined on the form as "more than a slight limitation in this area but the individual is still able to function satisfactorily."  Tr. 703.

Hines went to the ER on July 27, 2010, complaining of chest pain, shortness of breath, and dizziness.  She was admitted for atypical chest pain and ataxia.  It was noted that Hines's pain appeared to be related to anxiety/hysteria.  Several days later, she was seen at the NAHC to follow up on the ER visit.  She still had pain, which was worse with inspiration.  The assessment was non-cardiac chest pain.

On November 2, 2010, Hines was seen by Dr. Kalyani Eranki for a rheumatology consultation.  She had significant eczema on both hands.  An antinuclear antibody test ("ANA") was positive. The doctor reported that Hines seemed to have symptoms of Raynaud's syndrome.  At a follow-up appointment later in the month, Dr. Eranki discussed conservative treatment options.

## B.   Administrative Proceedings

After her claim for disability benefits was denied at the initial levels, Hines requested a hearing before an ALJ.  The hearing was held on September 11, 2008.  The ALJ issued an

unfavorable decision on November 3, 2008, and the Decision
Review Board ("DRB") reviewed the case.  On February 6, 2009,
the DRB vacated the ALJ's decision and remanded the case for a
further hearing to resolve several issues.  Among other things,
the DRB asked the ALJ to "evaluate the claimant's mental
impairments, consider further the claimant's maximum residual
functional capacity . . . and obtain vocational evidence."  Tr.
100.

Hines appeared before a different ALJ for a new hearing on
October 27, 2010.  Hines was represented by counsel.  She and
her father testified.  A vocational expert was also present but
was not asked to testify.

On December 23, 2010, the ALJ issued an unfavorable
decision.  At step two of the sequential analysis, the ALJ found
that Hines had the following severe impairments: panic disorder
without agoraphobia; borderline intellectual functioning;
asthma; and possible Raynaud's syndrome with a positive ANA
test.  At step three, he found that her impairments did not meet
or medically equal a listing.  The ALJ then determined that
Hines had the RFC to perform medium work, except that she "is
limited to work involving simple instructions" and "cannot be
exposed to excessive dust, fumes, gases, and extreme
temperatures."  Tr. 13.  At step five, the ALJ determined that

19

the additional limitations had no effect on the occupational
base of unskilled medium work and decided, based on the Medical-
Vocational Guidelines, that jobs existed in significant numbers
in the national economy that Hines could perform.  Accordingly,
the ALJ found that Hines was not disabled from February 19, 2007
through the date of the decision.

The DRB again selected the claim for review, but notified
Hines on March 29, 2011 that it did not complete its review
during the time allowed.  The ALJ's December 23, 2010 decision
therefore became the final decision of the Commissioner.

## II.  **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner.  My
review is limited to determining whether the ALJ used "the
proper legal standards and found facts [based] upon the proper
quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
as long as they are supported by substantial evidence.  Id.

Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the ALJ determines whether work that the claimant can do, despite his impairments,

exists in significant numbers in the national economy and must produce substantial evidence to support that finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.   ANALYSIS

Hines argues that the ALJ erroneously denied her claims for disability benefits because he failed to account for her panic disorder in the RFC assessment, improperly discounted certain medical source opinions, and improperly relied upon the Medical-Vocational Guidelines (the "Grid") to determine that she was not disabled.[3]  I address each challenge below.

### A.   The ALJ's RFC Assessment

Hines contends that the ALJ's RFC assessment is not supported by substantial evidence.  Specifically, she argues that the ALJ's decision is internally inconsistent because he found at step two that her panic disorder was a severe impairment but then failed to include in her RFC any functional restrictions associated with the impairment.  The argument lacks merit.

---

[3] Hines also argues that the ALJ failed to comply with instructions in the DRB's remand order.  Because my task is to decide whether the ALJ applied the correct legal standards and reached a decision that is supported by substantial evidence, the allegation is not relevant to my review of the ALJ's decision.  See 42 U.S.C. § 405(g); Wilkins v. Barnhart, 69 Fed. App'x. 775, 779 (7th Cir. 2003).

The determination at step two as to whether an impairment is severe is a *de minimis* test, designed to "screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1123 (1st Cir. 1986). All that is required of the claimant at this step is "to make a reasonable threshold showing that the impairment is one which could conceivably keep him or her from working." Id. at 1122. An ALJ's finding that an impairment is severe does not necessarily translate into functional restrictions in the RFC. See Griffeth v. Comm'r of Soc. Sec., 217 Fed. App'x 425, 428 (6th Cir. 2007) ("The ALJ's finding that the limitation was [severe], however, was not inherently inconsistent with his finding that the limitation has 'little effect' on the claimant's ability to perform basic work-related activities."); Sykes v. Apfel, 228 F.3d 259, 268 n.12 (3d Cir. 2000) ("A finding under step two of the regulations that a claimant has a 'severe' nonexertional limitation is not the same as a finding that the nonexertional limitation affects residual functional capacity"). Accordingly, although the ALJ determined that Hines's panic disorder was a severe impairment, he was not required to find that the impairment affected Hines's RFC.

With respect to her mental RFC, the ALJ determined that Hines was limited to work involving simple instructions, but

that she was able to use judgment, respond appropriately to supervision, co-workers, and usual work situations, and cope with routine changes in a work setting.  Hines argues that the ALJ's finding indicates that he rejected without adequate explanation all medical source opinions to the extent they identified functional limitations related to her panic disorder. Specifically, she points out that the ALJ gave significant weight to the opinions of Drs. Jamieson, Hadi, and Jasper, but failed to explain his treatment of their opinions that she had "moderate" limitations in her ability to respond appropriately to changes in a work setting and/or in her ability to interact appropriately with supervisors and co-workers.  Based on the definition of "moderate" common to all the opinions, I disagree.

The medical source and RFC evaluation forms that the doctors filled out all define a "moderate" limitation as "more than a slight limitation in this area but the individual is still able to function satisfactorily."  Given that the doctors in effect opined that Hines could still respond to changes in a work setting and interact with others at a satisfactory level, despite some difficulties, the ALJ's assessment is not inconsistent with their opinions.  See McLain v. Astrue, No. SACV 10-1108 JC, 2011 WL 2174895, at *6 (C.D. Cal. June 3, 2011) ("Moderate mental functional limitations – specifically

limitations in social functioning and adaptation - are not *per se* disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks.").

In fact, medical opinions indicating that a claimant is at most moderately limited in the relevant areas can "adequately substantiate" an ALJ's finding that the claimant can function in a work environment. Falcon-Cartagena v. Comm'r of Soc. Sec., 21 Fed. App'x 11, 14 (1st Cir. 2001); see Quintana v. Comm'r of Soc. Sec., 110 Fed. App'x. 142, 145 (1st Cir. 2004) (the ALJ's finding that claimant could "relate normally to supervisors and co-workers" is supported by treating psychiatrist's opinion that the claimant's social functioning was "only 'moderately' limited in most respects"). Here, the ALJ's assessment is bolstered by Nurse Manning, whose opinion stated that Hines had only a mild limitation in her ability to cope with work pressures and routine changes in a work setting, and no limitation in her ability to interact with others. The ALJ gave significant weight to that opinion. The ALJ was entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). Accordingly, the ALJ's RFC assessment is not internally inconsistent and is supported by substantial record evidence.

25

B.   **Weight Given to Opinions**

To the extent Hines also challenges the ALJ's decision to assign little weight to the opinions that arguably conflict with his RFC assessment, I conclude that the ALJ properly exercised his discretion to resolve conflicts in the record.

An ALJ must consider a number of factors in weighing medical source opinions, including the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the medical source is a specialist in the field.  20 C.F.R. § 404.1527(c)(1-6).  The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source."  SSR 06-03P, 2006 WL 2329939, at * 5 (Aug. 9, 2006).

Here, the ALJ gave little weight to Counselor Hayes's September 2008 opinion that Hines was not capable of gainful employment.  As the ALJ noted, Hayes had only been treating Hines for two months at the time she rendered her opinion, and Hines's counseling sessions ended three months later, with treatment notes indicating that her condition had improved. Moreover, Hayes's opinion is inconsistent with other medical

26

source opinions, and she is not an "acceptable medical source." 20 C.F.R. §§ 404.1502; 416.902.  Accordingly, I find no error in the ALJ's decision to give her opinion little weight.

The ALJ also gave little weight to Nurse Manning's opinion that Hines received frequent treatment for severe anxiety at the emergency room and the NAHC.  The ALJ acknowledged that certain treatment notes indicate that Hines's chest pains could be related to anxiety, but he instead relied upon the fact that both emergency and NAHC providers for the most part did not attribute her chest pain to anxiety.  Although the record "arguably could support a different conclusion," Irlanda Ortiz, 955 F.2d at 770, Hines's treatment notes adequately support the ALJ's decision, as her chest pain was most frequently diagnosed as either costochondritis or chest wall pain.[4]  As the ALJ noted,

---

[4] Hines also argues that the ALJ failed to recognize that many of her physical complaints and her compulsion to seek frequent medical attention were manifestations of anxiety.  Her Statement of Disputed Facts describes additional treatment records indicating complaints of back, neck, shoulder, arm, or knee pain at various times between October 2003 and October 2010.  The two treatment notes indicating that doctors recommended stress management in response to Hines's complaints are included in the Joint Statement of Facts.  The rest merely note that Hines complained of pain or numbness in different areas without any indication that doctors considered these to be due to anxiety. Accordingly, I agree with the Commissioner that those treatment notes do not support Hines's claim that the ALJ misunderstood her physical complaints.  The ALJ properly resolved any conflict in the evidence.  See Irlanda Ortiz, 955 F.2d at 769 ("[T]he

moreover, Nurse Manning "is not a psychologist or psychiatrist or even an acceptable medical provider."  Tr. 15.  Accordingly, the ALJ was entitled to give little weight to the opinion.

Lastly, the ALJ discounted Dr. Warman's conclusion that it would be difficult, though not impossible, for Hines to maintain concentration and attendance and to follow a schedule.  As the ALJ explained, the opinion is inconsistent with other medical opinions in the record, as well as Hines's activities of daily living.  The ALJ noted that she regularly attended medical appointments, used the city bus, and wrote short stories, all of which indicated greater ability than Dr. Warman assessed. Because substantial evidence supports the ALJ's treatment of the opinion evidence, a remand is not warranted on this basis.

C.    **Reliance on the Grid**

To support his step five finding that Hines was not disabled, the ALJ used the Grid[5] to determine that jobs existed in significant numbers in the national economy that Hines could

_____

resolution of conflicts in the evidence is for the [ALJ], not the courts.").

[5] The Grid is a matrix that sets out different combinations of a claimant's age, education, work experience, and exertional capacity, and provides, as to each combination, whether the claimant is disabled.  Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 2 (1st Cir. 1982).  "The ALJ simply selects the proper table and row based on the characteristics he finds the claimant to possess, and reads the decision, 'disabled' or 'not disabled' from the right-hand column in that row."  Id.

perform.  Hines contends that the ALJ erred in doing so because
he was required to obtain vocational expert testimony to clarify
the effect of her nonexertional limitations on the occupational
base.  I disagree.

The Grid allows the Commissioner to satisfy his burden at
step five without the opinion testimony of a vocational expert
when a claimant's limitations affect the strength requirements
of a job.  Seavey, 276 F.3d at 5; Ortiz v. Sec'y of Health &
Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).  "In cases
where a nonexertional impairment significantly affects [a]
claimant's ability to perform the full range of jobs he is
otherwise exertionally capable of performing, the Secretary must
carry his burden of proving the availability of jobs in the
national economy by other means, typically through the use of a
vocational expert."  Ortiz, 890 F.2d at 524 (quotations and
citations omitted).

An ALJ may rely on the Grid exclusively, however, if the
non-strength impairments "impose no significant restriction on
the range of work" a claimant can perform or if they only reduce
the occupational base "marginally."  Id.  With regard to mental
impairments, this determination involves the following inquiry:
"(1) whether a claimant can perform close to the full range of
unskilled work; and (2) whether [she] can conform to the demands

of a work setting, regardless of the skill level involved." Id. at 526.

Here, the ALJ specifically determined that the use of the Grid was appropriate because Hines's mental limitations "have little or no effect on the occupational base of unskilled medium work." Tr. 17. Substantial evidence supports the ALJ's conclusion. The Commissioner has described the mental capabilities required for unskilled work as follows:

> the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85-15, 1985 WL 56857, at *4. Here, most medical sources indicated that Hines could function satisfactorily in all three areas. First, both examining and non-examining sources agreed that Hines could understand, carry out, and remember simple instructions. Second, Drs. Warman, Jamieson, and Hadi, as well as treating Nurse Manning, all opined that Hines could interact appropriately with supervisors and co-workers. Third, Drs. Jamieson and Jasper indicated that Hines was only moderately limited in her ability to cope with work changes, and Dr. Hadi found a mild restriction in the area. According to the forms the doctors filled out, an individual with a moderate limitation "is still able to function satisfactorily." Accordingly, their

30

opinions support the ALJ's conclusion that, although Hines's panic disorder was a "severe" impairment at step two, it did not significantly compromise her capacity for unskilled work.

The First Circuit has recognized that moderate mental limitations impose no significant restriction on the range of work a claimant can perform.  See Falcon-Cartagena, 21 Fed. App'x at 14 ("[S]ince the RFC [] reports indicate that claimant was at the most moderately limited in areas of functioning required for unskilled work, we conclude that they adequately substantiate the ALJ's finding that claimant's mental impairment did not affect, more than marginally, the relevant occupational base.").  The ALJ was, therefore, justified in concluding that Hines's mental impairments did not preclude performance of substantially the full range of unskilled work.

The related inquiry regarding the claimant's ability to conform to the demands of a work environment is also satisfied here.  Conforming to the demands of a work setting involves "getting to work regularly . . . and remaining in the workplace for a full day."  SSR 85-15, 1985 WL 56857, at *6.  Medical sources agreed that Hines was only moderately limited in her ability to maintain attention and concentration and to perform work activities within a schedule.  Again, those moderate limitations do not significantly erode Hines's potential

31

occupational base because they do not preclude satisfactory
performance in the relevant areas.  Notably, the claimant in
Ortiz also was moderately limited in the exact same areas, and
the First Circuit agreed with the ALJ that "apart from [the
claimant] being relegated to jobs of an unskilled nature, the
claimant's capacity for the full range of light work was not
significantly compromised by his additional nonexertional
limitations."  890 F.2d at 527.  Finally, as in Ortiz, the
"claimant's characteristics did not position [her] near the
disabled/not disabled dividing line under the Grid rules."  See
id. at 527-28.  Even if Hines had been illiterate, the Grid
would have directed a finding of not disabled.  See 20 C.F.R.
Pt. 404, Subpt. P, App 2, Table No. 3, Rules 203.25-203.31.

     Accordingly, I find no error in the ALJ's reliance on the
Grid.  I echo, however, the First Circuit's cautionary message
that "an ALJ typically should err on the side of taking
vocational evidence when a [nonexertional] limitation is present
in order to avoid needless agency rehearings."  Ortiz, 890 F.2d
at 528.


                    IV.   **CONCLUSION**

     For the foregoing reasons, Hines's motion to reverse the
decision of the Commissioner (Doc. No. 13) is denied.  The

Commissioner's motion to affirm (Doc. No. 16) is granted.  The
clerk shall enter judgment accordingly and close the case.

    SO ORDERED.


                                 /s/Paul Barbadoro
                                 Paul Barbadoro
                                 United States District Judge

July 9, 2012

cc:   Janine Gawryl, Esq.
       Gretchen Leah Witt, Esq.

33